**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION NO. 5:12-CV-34**

| | |
|---|---|
| SELECTIVE INSURANCE COMPANY OF AMERICA, <br><br>**Plaintiff,** <br><br>v. <br><br>GLEN WILDE, LLC; CHARLES W. CARTER PLUMBING, INC.; H2H COMMERCIAL, LLC; LAKEY'S BACKHOE SERVICE, INC.; NEW RIVER BUILDING SUPPLY, INC.; PLYLER SUPPLY COMPANY; SHARP STONE SUPPLY, INC., RAMON TOLEDO GARCIA d/b/a TOLEDO COMPETITION PAINT COMPANY; TRI-COUNTY PAVING, INC.; ALAN S. MORRIS d/b/a TOTALLY FLOORED; AKERS CONSTRUCTION & ELECTRIC, INC.; CHANDLER CONCRETE CO., INC.; AND BUILDERS FIRSTSOURCE SOUTHEAST GROUP LLC <br><br>**Defendants.** <br><br>GLEN WILDE, LLC <br><br>**Third Party-Plaintiff,** <br><br>v. <br><br>WILLIAMS GENERAL CONTRACTING, INC., <br><br>**Third-Party Defendant.** | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>MEMORANDUM AND ORDER |

**BEFORE THE COURT** is Selective Insurance Company of America's ("Selective")

Motion for Summary Judgment. (Doc. 78). Defendant Ramon Garcia, d/b/a Toledo Competition

1

Paint Company ("Toledo"), filed a memorandum in opposition on June 21, 2013, (Doc. 97), to which Selective replied on July 15, 2013, (Doc. 109).

Also before the Court is Selective's Objections to Evidence Submitted by Alan S. Morris d/b/a Totally Floored and Other Defendants In Support of Their Opposition Briefs. (Doc. 113).[1]

For the following reasons Selective's Motion is Granted.

## I. BACKGROUND

This is an action brought pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02. Selective seeks a declaratory judgment that a Payment Bond and Performance Bond are not enforceable under North Carolina contract law. Selective's instant motion seeks summary judgment only on the issue of whether the Payment Bond is enforceable. (Doc. 78, ¶ 1).

All Defendants except for Toledo have been dismissed from the lawsuit.

This matter arises out of work performed in constructing a student apartment housing complex known as The Village at Glen Wilde ("the Project"). (Pl.'s Amended Compl., Doc. 43, at ¶ 20). Glen Wilde, LLC ("Glen Wilde") was the owner of the Project. (*Id.* at ¶ 20). Glen Wilde hired Williams General Contracting, Inc. ("Williams General") to be the general contractor for the Project (Doc. 43, ¶ 20; Cooke Aff., ¶ 2-3). Williams General also owns a thirty-four percent (34%) membership interest in Glen Wilde. (Cooke Aff., ¶ 3; Hicks 2d Aff., Doc. 111-9, at 4). John E. Cooke ("Cooke") acted on behalf of Glen Wilde as its member-manager. (Cooke Aff., ¶ 1). William R. Hicks ("Hicks") acted on behalf of Williams General and is the sole owner and President. (Doc. 111, ¶ 2).

On March 16, 2011 Hicks and Cooke signed two separate contracts on behalf of their respective entities for work on the Project, each dated March 1, 2011. (Doc. 80-1, at 6; Doc. 80-

---

[1] Although Toledo did not cite to the John Cooke affidavit in its response, the Court may consider all of the evidence in the record. Fed. R. Civ. P. 56(c)(1)(B)(3).

2, at 6). One contract was for site work ("Site Work Contract") for a price of $504,480 and the other for the vertical construction of the building ("Vertical Construction Contract") for $2,000,000. (Doc. 80-1, "Vertical Const. Contract," at 1; Doc. 80-2, "Site Work Contract," at 1). Each contract also has a merger clause. Both contracts have clauses after the signature lines that state "AMENDMENT: The Contract Price is based solely on oral conversations between Williams General Contracting, Inc. and Glen Wilde, LLC, and the Architect." (Vertical Const. Contract, at 6; Site Work Contract, at 6). Neither contract expressly mentions whether a payment or performance bond was required.

High Country Bank ("Bank") financed the construction of the Project. On a commitment letter dated March 8, 2011, the Bank required "the General Contractor [to] provide a Performance Bond, based on contract between the Builder and Borrower." (Doc. 80-5, "Commitment Letter", at 7). There is no similar requirement stated for a Payment Bond. Hicks signed the letter as a personal guarantor, not on behalf of Williams General. (Hicks 2d Aff., ¶ 21). The commitment letter also provides, in part that, "[t]his letter, together with the Loan Documents, constitutes the entire agreement between the Bank and the Borrower." (Commitment Letter, at 8).

On March 1, 2011 Selective sent Williams the Payment Bond, which provided that Selective would be the surety, Williams would be the principal, and Glen Wilde would be the obligee. (Doc. 97-2, Payment Bond, at 1). The Payment Bond was for two million dollars ($2,000,000.00) for the use and benefit of "claimants", which would include Toledo. (*Id.* at 2, ¶ 1). Reference was made specifically to the Vertical Construction Contract dated March 1, 2011 which was incorporated by reference. (*Id.* at 1). The Payment Bond has two signature blocks and witness blocks. (*Id.* at 2). The bottom block was signed by Ronda W. Bush on behalf of Selective Insurance and was witnessed. (*Id.* at 2). The top block had "Williams General Contracting, Inc."

3

listed as principal but was otherwise unsigned and unwitnessed. (*Id.* at 2). Nowhere on the Payment Bond is the price for the premium.

However, on or about June 2, 2011[2] Williams General issued a "Change Order #4" requesting to be paid $ 23,500.00 for the price of the premium paid to Selective, along with a ten percent markup. (Doc. 80-4). The Change Order #4 was denied by Glen Wilde. Selective Insurance refunded the premium to Williams General sometime in May 2012 after disputes arose between Glen Wilde and Williams General and after Toledo and former subcontractor co-defendants filed claims on the Payment Bond. (Cooke Aff., at ¶ 12).

A dispute arose between Glen Wilde and Williams General over the quality of the work performed on the Project. (Doc. 43, at ¶ 26). Further, many subcontractors, including Toledo, have not been paid by Williams. (Doc. 43, ¶ 29). Glen Wilde informed Toledo that there was a Payment Bond for the Project and Toledo then filed a claim. (Doc. 43, ¶ 36). Specifically, Frank Wilson provided a copy of the Payment Bond on January 26, 2012 stating that it "was issued for this project by Williams Contracting, Inc. as principal and Selective Insurance Company of America as surety." (Doc. 97-6).

Selective filed its complaint on March 22, 2012. (Doc. 1). It appears that on or about May 18, 2012 Selective "issued a return of premium check" made by Williams General and placed it in escrow pending the result of this lawsuit. (Doc. 87-5. at 25).

## II. MOTION TO STRIKE

Selective moves to strike from the Cooke affidavit paragraphs four, six, eight, and nine in their entirety, and the last sentence of paragraph eleven. (Doc. 113, at 2).

      A.      Selective's Motion to Strike Paragraph Four is Granted

---

[2] The ten percent markup is listed on June 2, 2011. However, on May 2, 2011 it states "[p]rovide bond State Farm Rd Apartments Vertical Construction."

4

Paragraph Four of the Cooke Affidavit states:

> High Country Bank (the "Bank") financed the construction of the Project. Although the loan commitment letter references only a performance bond, the Bank required both a payment and performance bond for the Project. This requirement was known to Glen Wilde and Williams General Contracting before the contract for construction between Glen Wilde and Williams General Contracting was signed. The contract price for the work therefore included the cost of both a payment and performance bond.

Selective first argues that all the assertions "lack foundation, are speculative, and constitute incompetent opinion." There is ample evidence in the record that Cooke acted on behalf of Glen Wilde in all negotiations (Cooke Aff., at ¶ 1) and his signature appears on many, if not all, of the contracts. Given that there is evidence in record showing that Cooke was the representative party for Glen Wilde during the negotiations for both of these contracts, the court declines to strike them as speculative or because they lack a proper foundation.

The crux of Selective's argument is that the statements regarding whether the Bank required a payment bond and whether the Vertical Construction Contract price included a payment bond violate the parol evidence rule.

"A contract which is plain and unambiguous on its face will be interpreted as a matter of law by the court. If the agreement is ambiguous, however, interpretation of the contract is a matter for the jury." *Metcalf v. Black Dog Realty, LLC*, 684 S.E.2d 709, 719 (N.C. Ct. App. 2009) (quoting *Dockery v. Quality Plastic Custom Molding, Inc.* 457 S.E.2d 850, 852 (N.C. Ct. App. 2001)). "Contracts are interpreted according to the intent of the parties. The intent of the parties is determined by examining the plain language of the contract. Extrinsic evidence may be consulted when the plain language of the contract is ambiguous." *Id.* (quoting *Brown v. Ginn*, 640 S.E.2d 787, 789-90 (N.C. Ct. App. 2007)).

The North Carolina Court of Appeals described the parol evidence rule as follows:

> Where the parties have deliberately put their engagements in writing in such terms as import a legal obligation free of uncertainty, it is presumed that the writing was intended by the parties to represent all their engagements as to the elements dealt with in the writing. As a result, the parol evidence rule prevents the introduction of extrinsic evidence of agreements or understandings contemporaneous with or prior to execution of a written instrument when the extrinsic evidence is used to contradict, vary, or explain the written instrument. However, when a part of the contract is in parol and part in writing, the parol part can be proven if it does not contradict or change that which is written.

*Capital Res., LLC v. Chelda, Inc.*, 735 S.E.2d 203, 210 (N.C. Ct. App. 2012) (internal citations, quotations, and alterations omitted).

"Generally speaking, North Carolina recognizes and gives effect to merger clauses." *Franco v. Lipoliscience, Inc.*, 676 S.E.2d 500, 507-08 *aff'd* 686 S.E.2d 152 (N.C. 2009). However, there are exceptions that allow variance or expansion of the contents of a written agreement. The first exception concerns allegations of fraud or mistake. *Id.* Second, "where giving effect to the merger clause would frustrate and distort the parties' true intentions and understanding regarding the contract, the clause will not be enforced." *Id.* (quotation and citation omitted.). The second exception applies where "the parties' conduct indicates their intention to include collateral agreements or writings despite the existence of the merger clause and the parol evidence is not markedly different, if at all, from the written contract." *Id.* (quotation omitted).

1. Parol Evidence and the Vertical Construction Contract

Paragraph 4 comes within the rule because it concerns prior or contemporaneous discussions about bonding. Therefore, if the contract is unambiguous the court will interpret it according to its plain meaning and Cooke's averments will be ignored. However, if ambiguous, extrinsic evidence may have to be examined and summary judgment would likely be

6

inappropriate.  The Vertical Construction Contract also contains a merger clause – however, even a merger clause may be overcome as noted above.

At the outset, the Contract does not have any clauses concerning bonding.  Article 4, entitled "The Contract Price", does not mention bonding.  Under Article 6, entitled "Duties of the Contractor", there is no mention of bonding.  However, bonding is also not mentioned in Article 7 entitled "Duties of the Owner."

A potential wrinkle exists in that there is a clause after the signature lines that reads:

> AMENDMENT: The Contract Price is based solely on oral conversations between Williams General Contracting, Inc. and Glen Wilde, LLC, and Architect.  Upon receipt of a full set of stamped drawings with a spec sheet from the Architect, the contract price will be verified.  The Total Contract Price is for vertical construction only and does not include site work.

The Court will interpret the clause as a whole.  The Court finds no ambiguity that would allow admission of parol testimony involving duties to pay for bonding as a requirement of the Vertical Construction Contract.  The clause is clear on its face in that it allows some wiggle room on the final price based on material provided from the Architect.  The Court need not even peruse all of the architect's material provided by Selective in order to sustain Selective's motion to strike this testimony.

2. Parol Evidence and the Commitment Letter.

The Commitment Letter is also plain on its face.  The Commitment Letter explicitly requires a Performance Bond.  (Commitment Letter, at 7).  It also has a merger clause.  Unlike the Vertical Construction Contract, there is no reference to oral discussions.  As with all the contracts involved in this case, the parties are well versed in the importance of written contracts for business purposes.  Therefore, Paragraph 4 of the Cooke Affidavit is **STRICKEN** in its entirety.

B. Selective's Motion to Strike Paragraph Six is Denied

Paragraph Six of the Cooke Affidavit states:

> When the payment and performance bonds were delivered to Williams General Contracting by Selective Insurance Company of America, there were no conditions expressed to me for the effectiveness of the bonds in my conversation with Mr. Hicks, and I understood from him that the payment and performance bonds were delivered to Glen Wilde by delivering them to Williams General Contracting as a member of Glen Wilde.

Selective desires to strike this testimony, in part, because Mr. Cooke does not have personal knowledge of the facts and has not established a foundation for what was expressed to him. The Court finds ample evidence in the record, including Cooke's affidavit, to deny this motion to strike. The Court finds that it would be inappropriate to strike the testimony on lack of foundation when there is ample evidence to show that Hicks and Cooke had a multitude of conversations. Indeed, Paragraph 6 implies that there was a conversation after delivery of the bonds to Williams General.

Selective also objects under relevance and argues that it is unfairly prejudicial. The Court will address further below the relevance of these alleged statements; however, it is sufficient to say that if Williams General were acting as an agent of Glen Wilde in receiving the bonding materials then a material issue in this matter would be resolved.

Accordingly, the Court **DENIES** Selective's Motion to Strike Paragraph 6.

C. Selective's Motion to Strike Paragraph Eight is Granted

Paragraph Eight of the Cooke Affidavit provides that

> I did not agree with this proposed change order because the cost of the bonds was supposed to be included in the contract price from Williams General Contracting for the Project.

Here, Cooke's opinion conflicts with the plain meaning of the Vertical Construction Contract as established above. Therefore, for the reasons stated in the discussion involving Paragraph 4, the Court **STRIKES** Paragraph 8 of the Cooke affidavit.

### D. Selective's Motion to Strike Paragraph Nine is Granted

Paragraph Nine of the Cooke Affidavit states:

> Nevertheless, I expected the payment and performance bonds to remain in place, and it was always my understanding during the construction of the Project that the bonds were in fact in place. I was never advised otherwise, and I was never advised that there were any conditions to make the bonds effective that had not occurred.

Paragraph Nine provides context for the reasoning for rejecting the change order. Selective's motion references its objections to Paragraph 6, and the Court disregards them for the same reasons stated above. Selective also states it is inconsistent with the fact that a change order was issued – stating that it was "notice to Mr. Cooke and Glen Wilde that the bonds would not be effective unless Glen Wilde paid the premium." (Doc. 113, at 5). Under the Vertical Construction Contract, "[a] change order is any change in the original plans and/or specifications." (Vertical Const. Contract, at art. 8.1). Having already established that the Vertical Construction Contract did not require Williams General to pay for the Payment Bond and that by definition, a change order is a modification, Cooke's opinion is legally irrelevant. Cooke's expectation of whether the bonds remained in place is not relevant to whether they were in place after he rejected the opportunity to pay for the Payment Bond. Moreover, the fact that Williams was making a demand for payment of the premium would have at least put Mr. Cooke on notice that an issue over an effective bond existed and that mere inaction on his part would not suffice to resolve it. Therefore, Paragraph Nine is **STRICKEN**.

### E. Selective's Motion to Strike the Last Sentence of Paragraph Eleven is Granted

Selective desires this Court to strike the last sentence of Paragraph Eleven which reads "In January 2012, Glen Wilde asserted a claim against Williams General Contracting's performance bond that had been issued by Selective Insurance Company of America." Selective complains that

9

this is an impermissible legal conclusion and that Cooke is not competent to testify about whether the Performance Bond is enforceable. Selective also argues that because the instant motion addresses only the Payment Bond, the Court should strike under Federal Rules of Evidence 401 and 403. The Court agrees with Selective's arguments. Therefore, the last sentence of Paragraph 11 is **STRICKEN.**

### III. SUMMARY JUDGMENT ANALYSIS

#### A. Standard of Review

Summary judgment is appropriate where an examination of the pleadings, affidavits, and other discovery materials properly before the court demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to find for the non-moving party). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then "set forth specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Anderson*, 477 U.S. at 250. In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

To the extent this Court must draw conclusions about matters of North Carolina law in evaluating summary judgment issues, the Supreme Court of North Carolina "is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law unless it has later given clear and persuasive indication that its pronouncement will be modified, limited or restricted." *West v. American Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940). When the Supreme Court of North Carolina has not passed on the issue, "it is the duty of [this Court] to ascertain from all the available data what the state law is and apply it." *Id.* at 237. Therefore, this Court will apply the rulings of the Appellate and Superior Courts unless there is a persuasive indication that the Supreme Court of North Carolina would decide otherwise. *Id.*

B.  **SUMMARY JUDGMENT IS APPROPRIATE**

Selective's motion for summary judgment is based upon a number of purported contract defects. Surety agreements are subject to the law of contract when there is not specific surety case law covering the matter. *See O'Grady v. First Union Nat. Bank*, 250 S.E.2d 587, 559 (N.C. 1978) (referring to guaranty). "[S]uretyship creates a tripartite relationship between and among the party secured (the bond obligee), the principal (the bond obligor), and the party secondarily liable (the surety)." *Se. Steel Erectors, Inc. v. Inco, Inc.*, 424 S.E.2d 433, 438 (N.C. 1993) (quoting B.C. Hart, *Bad Faith Litigation Against Sureties*, 24 Tort and ns.L.J. 18 (1988)).

In construction settings like the one at issue:

> the parties to this tripartite relationship are typically the bonding company (the surety), the general or prime contractor (the principal), and the project owner (the obligee). Under this scenario, the owner requires that the general contractor provide a performance bond, under which the surety will be obligated up to the penal sum of the bond for the cost of completing the work in the event the general contractor defaults. The owner also requires a payment bond for the benefit of the contractor's subcontractors and

> suppliers on the project who are not paid, in order to protect the owner from claims from these parties. This tripartite arrangement typically revolves around the prime contract and includes the project owner, the general contractor, and the surety.

North Carolina Construction Law § 4:1 (Nov. 2013). A payment bond is "not given to secure performance of the contract between [the principal] and [the obligee] but to secure the performance of the contracts between [the principal] and his suppliers of labor and materials so as to enable [the principal] to procure labor and materials on credit." *RGK, Inc. v. U.S. Fidelity & Guaranty Co.*, 235 S.E.2d 234, 244-245 (N.C. 1977) (discussing statutory surety bonds).

Selective claims that the Payment Bond suffers from the following contract-formation defects (1) no offer and acceptance and meeting of the minds because the bond was not signed by the principal and delivered to the obligee; and (2) lack of acceptance and consideration. The Court will address Selective's arguments in turn.

It has been long held that in order for a contract to exist, there must be offer and acceptance. *See Burns v. Allen*, 33 N.C. 25 (1850). Briefly, Selective claims Glen Wilde never accepted the offer because the Payment Bond was never delivered to Glen Wilde. Selective argues Glen Wilde declined the offer by failing to approve the Change Order. Selective also contends that Glen Wilde could not have accepted the offer because the Payment Bond instrument was never physically delivered to it. Selective also claims that a meeting of the minds between it and Williams General never occurred because there was a condition (which must be implied) that Williams General execute the Payment Bond.

Selective argues there was a failure of delivery of the Bond to Glen Wilde. Selective argues that delivery is required under North Carolina law. In support of its assertion, Selective maintains that Williams General never physically gave a copy of the Payment Bond to Glen

12

Wilde. Glen Wilde's counsel appears to have received a physical copy from Knauff Insurance Agency. (Doc. 119, at 5).

The case of *Respass v. Latham*, 44 N.C. 138 (1852) elucidates the delivery requirement. In *Respass*, defendants signed a surety agreement with Ellison as the principal and Mrs. Parker as the obligee. *Id.* at 140-41. The surety contract explicitly required the obligee to sign and she did not. *Id.* at 141. This delivery failed because she refused to accept it. *Id.* at 142. Later, the principal (Ellison) indorsed the surety agreement to a third party, Respass, who then signed it. The Court held that because the second delivery was unauthorized, it could not bind the sureties to an obligee to whom they did not consent. *Id.* In so holding, the Court analogized the delivery of a surety agreement to a deed when stating:

> Delivery is an essential part of every deed, and as there is no set form of words or of acts by which it may be done, any words or acts on the part of the obligor or grantor, which show the *animus disponendi* [intent to deliver], will be sufficient. It is not pretended that when first presented to Mrs. Parker, there was any delivery, for she expressly refused to accept it; and acceptance by the grantee or obligee, is as necessary to a valid delivery as the transfer on the part of the grantor or obligor

*Id.* at 141.

"Delivery consists of two elements: First, an intention to pass an item beyond one's control; and, second, physical transfer of the item to another." *Branch Banking & Trust Co. v. Creasy*, 269 S.E.2d 117, 123 (N.C. 1980) (citing *Tarlton v. Griggs*, 42 S.E. 591 (N.C. 1902)). Selective urges the Court to find that physical delivery from Williams General to Glen Wilde is necessary.

Selective repeatedly argues that it retained control over the bond because of implied conditions. There is a disputed factual issue as to whether Selective retained control sufficient to

13

recall it. In *Tarlton*, the Supreme Court of North Carolina stated that "there is no delivery, where the maker has not gone so far with its execution that he cannot recall or control it." On the face of the Payment Bond there are no conditions. In fact, the Payment Bond says, in part, that "THIS BOND IS ISSUED." (Payment Bond at 1). Further, it states that Selective is "held and firmly bound unto Glen Wilde, LLC." (*Id.*). "When the undertaking of a surety is complete and regular on its face, and the obligee has no notice of conditions which have been imposed by the surety, the creditor is entitled to enforce the promise of the surety." *Branch Banking and Trust Co. v. Creasy*, 269 S.E.2d 117, 123 (N.C. 1980). The Bond appears final on its face, and as stated below, any implied conditions are an issue of fact.

Selective next argues for a strict interpretation of the physical transfer requirement. Selective argues that Williams General must have handed the Payment Bond to Glen Wilde. The parties agree that Glen Wilde's counsel received a copy of it from the Knauff Insurance Agency. Cooke asserts that as a matter of agency and from conversations with Hicks, the "payment and performance bonds were delivered to Glen Wilde by delivering them to Williams General Contracting as a member of Glen Wilde." (Cooke Aff., at ¶ 5-6). Williams General denies the agency allegations (Hicks 2d Aff. at ¶¶ 14-18, 23). Selective's Senior Underwriter states that "[t]he Bonds were sent only to Williams as the potential principal, not to Williams as a member of Glen Wilde." (Vallandingham Aff., at ¶ 8). Viewing the facts in the light most favorable to Toledo, there is a dispute as to whether that agency existed – even if actual physical delivery were required.

Neither party has given the Court binding North Carolina case law on how or whether as part of a surety arrangement the obligee must physically receive the surety agreement.[3] In *Respass*,

---
[3] There was nothing for Glen Wilde to sign or execute on the Payment Bond.

the obligee rejected the surety arrangement outright. In *Whitsell v. Mebane*, 64 N.C. 345 (1870) there were conditions precedent that were required to be performed before the bond was to be effective. As such, the third party was deemed to be the agent of the surety. It was clear that the surety wanted physical delivery as well. Regardless, the Court held that because conditions precedent were not performed any delivery exceeded the scope of agency and thus was void. *Id.* at 347-48. In *Tarlton*, which *Branch Banking* cited as authority for delivery in a surety arrangement, there was evidence that delivery of a deed was conditional which would prevent contract formation if those conditions were not fulfilled. 42 S.E. at 594. Notably, the *Tarlton* decision itself contemplates third party delivery when stating that, with regards to delivery,

> [n]o particular form or ceremony is necessary. It will be sufficient if a party testifies his intention in any manner, whether by action or by word, to deliver or put it into possession of the other party; as, if a party throw a deed upon a table, with the intent that it may be taken by the other, who accordingly takes it, or if a stranger deliver it with the assent of the party to the deed.

*Id. at* 592. When utilizing third-party delivery without conditions, "the delivery is complete and the title passes at once, although the grantee may be ignorant of the facts, and no subsequent act of the grantor or any one else can defeat the effect of such delivery[.]" *Gifford v. Linell*, 579 S.E.2d 440, 442 (N.C. Ct. App. 2003). The Court also finds a genuine issue of material fact as to whether delivery to Williams was for the purpose of sending it to Glen Wilde.[4]

The contract-formation argument Selective makes is that Glen Wilde never accepted. In fact, Selective argues that Glen Wilde expressly rejected bonding by failing to approve the Change

---

[4] *Accord Central Nat. Ins. Co. of Omaha v. Whitehall Const., Inc.*, No. 86C7167, 1988 WL 23789 at *6 (N.D. Ill. Mar. 4, 1988) (citing Couch on Insurance 2d § 10:24) ("The weight of authority holds that when a surety delivers a contractor's bond to a contractor who is a principal, with the apparent intent of irrevocably and unconditionally parting with the bond, this constitutes delivery of the bond to the obligee, even if the contractor never delivers the bond to the obligee."). *Tanco, Inc. v. Houston General Ins. Co.*, 555 P.2d 1164, 1166 (Colo. Ct. App. 1976) ("delivery to the obligee may occur when bonds are delivered to the principal for signature"); *Flora v. Aetna Cas. & Sur. Co.*, 24 Cal. Rptr. 305, 307 (Cal. Ct. App. 1962).

Order.[5] As the Court has already held, the Vertical Construction Contract did not call for a Payment Bond which differs from the usual situation presented in the North Carolina Construction Law treatise which states that the tripartite relationship revolves around the prime contract. Here, the prime contract does not call for the creation of such a tripartite relationship. Accordingly, the Charge Order must be seen as the offer. In rejecting the Charge Order, which by the terms of the Vertical Construction Contract is a modification, Glen Wilde rejected bonding altogether. Rejection, as *Respass* states, terminates the offer. Toledo's rights depend on the validity of the Payment Bond.[6] It is clear that if Glen Wilde were allowed the protection of the Payment Bond, there would be a failure of consideration. The Vertical Construction contract did not call for a Payment Bond, therefore any consideration given to Williams General could not have been for the Payment Bond. Therefore, under general contract law, Glen Wilde could not receive the benefits of the Payment Bond because it did not accept the modification request by paying the price of the Bond. Therefore, summary judgment must be **GRANTED** in favor of Selective.

---

[5] The fact that a Charge Order was issued also shows that there was no intent to give the Payment Bond as a gift which is what would result if Glen Wilde were not required to pay.

[6] Dismissed Defendant New River Building Supply, Inc.'s Response (Doc. 105) relied on *RGK, Inc. v. U.S. Fidelity & Guaranty Co.*, 235 S.E.2d 234, 243 (N.C. 1977) where the Supreme Court of North Carolina quoted 17 Am. Jr. 2d, Contrator's Bond, § 16 in stating:

> The mere fact that laborers and materialmen did not know of the existence of a contractor's bond to the owner, conditioned for their benefit, at the time they furnished the materials or labor, does not prevent them from availing themselves of the protection of the bond. Furthermore, since the rights of laborers and materialmen are independent of the right of the obligee in the bond, it is generally held that their right to recover against a surety on such a bond cannot be defeated by any act or omission of the obligee named in the bond, not authorized or participated in by the laborers or materialmen, even though the conduct or default is such as would release the surety from liability to the obligee.

*Id.* at 243. While it is a correct statement of the law, *RGK* is inapplicable to the situation where a surety arrangement never existed because of failure of acceptance.

**IT IS, THEREFORE, ORDERED THAT** Selective Insurance Company of America's Motion for Summary Judgment (Doc. 78) be **GRANTED**.

Signed: March 30, 2015

Richard L. Voorhees
United States District Judge